**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MARKELITO SAINT HUBERT,

     Plaintiff,

v.                        Case No: 8:23-cv-2799-CEH-NHA

GULF HOSPITALITY
MANAGEMENT, LLC,

     Defendant.

_____

**<u>ORDER</u>**

This matter comes before the Court on Defendant Gulf Hospitality Management, LLC's Motion for Summary Judgment (Doc. 29), Plaintiff Markelito Saint Hubert's response in opposition (Docs. 37, 38), and Defendant's reply (Doc. 42).

In this employment action, Plaintiff alleges that he was terminated as a result of racial discrimination and retaliation for his complaints about Defendant's discriminatory treatment against African American employees. Doc. 1.

Upon review and consideration, and being fully advised in the premises, the Court will grant the motion, because no genuine issue of material fact exists and Defendant is entitled to judgment as a matter of law.

## I.    FACTUAL BACKGROUND[1]

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including exhibits, and the Stipulation of Agreed Material Facts (Doc. 41). For purposes of summary judgment, the Court considers the facts in the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

### A. Plaintiff's Employment

Plaintiff Markelito Saint Hubert was employed at the TradeWinds Resort in St. Pete Beach, Florida, from 1999 to 2020. Doc. 41 ¶¶ 1, 11.  Fortune Hotels, Inc., owned the TradeWinds for most of Plaintiff's employment, until October 2019 when an entity called 1754 Properties purchased it. *Id.* ¶¶ 1, 4.[2]  1754 Properties contracted its affiliate, Defendant Gulf Hospitality Management, LLC, to manage the TradeWinds. *Id.* ¶ 4. 1754 Properties' asset management team, led by Joe Smith and Joe Kelley, was involved in the resort's day-to-day operations, to the extent that "nothing was done there without [their] blessing." Doc. 38-1 at 45.

Plaintiff held several different positions during his time at the TradeWinds, moving up in the ranks from a floor manager in the housekeeping department, to the resort-wide Assistant Director of Housekeeping, to the Director of Housekeeping, to the Director of Back of the House Operations in July 2019. Doc. 41 ¶¶ 2-3.  In this last role, Plaintiff was responsible for overseeing and managing the housekeeping, laundry, and engineering (maintenance) departments for the entire resort. *Id.* ¶ 3.

As the Director of Back of the House Operations, Plaintiff was a member of the resort's executive committee, which consisted of "six to eight individuals who were tasked with running the day-to-day operations of the hotel." *Id.* ¶ 3.  Plaintiff was one of two director-level employees on the executive committee, which otherwise

---

[2] When Fortune Hotels sold the TradeWinds, it offered Plaintiff a portion of the proceeds in return for a general release from liability for any claims Plaintiff may have had against it prior to November 7, 2019. Doc. 29-1 at 56-58.  Plaintiff disputes the enforceability of the release. Doc. 38-1 at 26-30.

consisted of vice presidents and General Manager Travis Johnson. *Id.* ¶ 7. The other director-level position on the executive committee was held by Tim Johnson, the Director of Front of the House Operations.[3] *Id.*  Plaintiff, who was born in Haiti, was the only African American member of the executive committee. Doc. 38-1 at 10, 79; Doc. 38-2 at 15.

### B.  Plaintiff's Allegations of Past Discrimination and Complaints

Plaintiff testified in his deposition that it was his long-term goal to become the TradeWinds' general manager. Doc. 38-1 at 17.  Plaintiff believed he was being groomed for this role by his supervisor, James Metro, for whom he served as right-hand man while Metro rose through the ranks. *Id.* at 13-14, 18.  Plaintiff earned a master's degree in business administration, with a concentration in marketing, as a step toward that goal. *Id.* at 17, 114-15.  The resort's then-CEO, Keith Overton, told Plaintiff in approximately 2003 that he would need both front of the house and back of the house experience to become a general manager. *Id.* at 17.  From then on, Plaintiff had attempted to transition to the front of the house by expressing his interest in doing so to Overton and Metro, including in at least four formal meetings with Overton. *Id.* at 16-18, 112.  He even told Overton he was willing to take a demotion to go to the front. *Id.* at 126.  However, Plaintiff was repeatedly told that there were no open front of house positions—but then would learn that a position had been open and was filled by someone else without a formal announcement or opening. *Id.* at 16-18,

---

[3] "Front of the house" or "front of house" departments are public-facing, such as the front desk, the marketing department, and the reservations department. Doc. 38-1 at 15.

115, 127.  All the people who received the front of house positions that became open were white. *Id.* at 113.  It was Plaintiff's observation during his time at the TradeWinds that back of house employees were primarily African American or international workers, while front of house employees were predominantly white. *Id.* at 114.

When James Metro left the company in 2019, Overton hand-picked Plaintiff to take over for him and serve as the resort's Director of Back of the House Operations. *Id.* at 19.  However, Overton imposed an unprecedented requirement that Plaintiff speak to every member of the executive committee before allowing him to take the position; Overton told him he was doing so because some committee members "did not want to work with a person like me," which Plaintiff understood to refer to his race. *Id.* at 19-20, 116.

Plaintiff oversaw the engineering department in his new role, including Director of Engineering Steve George. *See id.* at 61-63.  James Metro had warned him that George would have a problem with him, which Plaintiff also understood to refer to Plaintiff's race.  *Id.*   George and the engineering department repeatedly failed to provide Plaintiff with data and other tasks that he needed from them, particularly after October 2019 when the resort's new owners were making a number of requests. *Id.* at 134, 94.  George would avoid Plaintiff, or say "f--- me" and leave the room when Plaintiff came to his department. *Id.* at 94-95.  Plaintiff complained to Overton, who advised him to wait until the end of the year when George was expected to retire. *Id.* at 62-63. When Travis Johnson became the acting general manager in Overton's stead in January 2020, Johnson expressed concern about the engineering department but

failed to investigate George's behavior. *Id.* at 95. Moreover, just days after Johnson assumed his new position, Johnson gave Plaintiff a negative performance evaluation based in part on the ongoing issues with the engineering department. *Id.* at 108-09.

The "peak" of the issues with the engineering department occurred in March 2020, when Plaintiff and human resources ("HR") director Jacqueline Duchene had a termination meeting with engineering manager Randy Reese during a round of COVID-19 layoffs. *Id.* at 65-66, 135. Immediately after being terminated, Reese stated to Steve George, "This n----- just fired me and this b---- just sat there and let them fire me." *Id.* at 65, 77-78. The conversation between Reese and George was in earshot of several of Plaintiff's employees, some of whom called Plaintiff afterward to discuss it. *Id.* at 78, 131. Although George did not use the same language himself, he verbally agreed that Reese should not have been fired, and did not address Reese's language. *Id.* at 77-78. Plaintiff reported the incident to Duchene, seeking an investigation into George's failure to address Reese's use of the N-word to describe Plaintiff in front of other employees. *Id.* at 74-75. Duchene brushed off his complaint and did not investigate. *Id.* at 79, 87, 122, 133. Plaintiff was furloughed just days later. *Id.*

Based on his observations of Duchene during HR interactions with his staff, Plaintiff believes she treated African American employees more negatively than white employees. Doc. 68-79, 81-82, 91-92, 119-20. He made complaints to Duchene in 2019 about some of these events. *Id.* at 92-93. Plaintiff believes Duchene would have shared his complaints with her supervisor, Vice President of Human Resources Glenn Willocks, because she would typically "bring Glenn into the conversation before the

ultimate decision" for any HR issues; they "were essentially one [and] the same." *Id.* at 93.

In addition, an incident occurred in approximately 2018 that caused Plaintiff's supervisor, James Metro, to make a complaint about Duchene to Willocks. *Id.* at 57, 74. Duchene would sometimes display a toy guillotine on her desk when she terminated employees, and Plaintiff believes she did so particularly when terminating African-American employees. *Id.* at 70-74.[4] Willocks did not respond favorably to Metro's complaint, which Plaintiff believes Willocks and Duchene assumed came from him. *Id.* at 71, 89. Willocks was one of the members of the executive committee who gave Plaintiff the "cold shoulder" when Plaintiff was promoted, and who Keith Overton told him was unhappy with Plaintiff's promotion. *Id.* at 116.

### C. Plaintiff's Termination

The COVID-19 pandemic began in early 2020 and led to a "sudden and immediate drop" in the Tradewinds' revenue. Doc. 41 ¶¶ 8-9. Although the resort remained open, its occupancy rate dropped close to zero in March 2020, and continued to fluctuate throughout 2020. *Id.* Defendant began taking cost-cutting measures in mid-March, including the shutdown of several of the resort's buildings, significant reductions in hours for hourly employees, and a 20 percent pay cut for the entire executive committee, including Plaintiff. *Id.* ¶ 9. Ultimately, Defendant furloughed hundreds of both hourly and management-level employees. *Id.* ¶ 10.

---

[4] Duchene denies that she ever displayed the guillotine, which was a gag gift from a coworker. Doc. 38-4 at 11.

Plaintiff was furloughed on March 26, 2020. *Id.* Defendant's corporate representative stated that Plaintiff was furloughed because "[b]usiness demand just obviously fell completely off after the pandemic in 2020," and that furloughs were part of "a series of adjustments to try to manage the business that we did have." Doc. 38-2 at 16. In a form letter dated March 25, 2020, Defendant informed Plaintiff of "what we hope is a temporary separation of employment" in light of the "state of our country and the unknowns of the Coronavirus Disease (COVID-19)" and the "many regulations that affect the travel industry, our company, and each member of our team." Doc. 29-1 at 59.

Tim Johnson, the Director of Front of the House Operations, was also furloughed. Doc. 41 ¶ 10. However, he was brought back from furlough after about seven weeks. Doc. 38-2 at 18-19. Defendant's corporate representative testified that Johnson was brought back because business had increased enough for Defendant to "start bringing back some strategic positions back into play to…manage the business." *Id.* at 19. In choosing which positions to bring back, Defendant had to be "strategic in terms of…what positions can come in to balance your expenses with your revenues and give your guests the best possible experience." *Id.* at 20. This was because the increase in business was slow and inconsistent; by July 2020, it was still not "anywhere near occupancy levels pre-COVID." *Id.* at 19, 36. Therefore, Defendant expanded the responsibility of the roles it brought back, in order to cover or absorb the ones that were not brought back. *Id.* at 22, 24.

On July 13, 2020, General Manager Travis Johnson and Vice President of HR Glenn Willocks called Plaintiff to notify him that his employment would be terminated as of September 11, 2020. Doc. 41 ¶ 11; Doc. 38-1 at 39-40.   In a form letter titled "Notice of Employment Termination," Defendant stated that the termination was occurring because Defendant could not "accurately predict when we may be able to return to full staffing levels" in light of the uncertainty regarding "whether in the next few months the state will return to reopening or will end up in a worse situation in the fall." Doc. 29-1 at 61.  Defendant cited the fact that "COVID-19 cases in Florida have precipitously jumped…potentially representing a second wave of issues," and that Florida had recently issued an emergency order preventing the consumption of alcohol at bars. *Id.*

The decision to terminate Plaintiff was made by Travis Johnson, "in conjunction with…ownership's asset management team" and Bob Lacasse, the resort's managing director who was hired in June 2020. Doc. 29-3 at 5; Doc. 38-2 at 26-27; *see* Doc. 38-1 at 54.  Joe Kelley was the "main liaison" between 1754 Properties' asset management group and the TradeWinds. Doc. 38-2 at 27.  Plaintiff is not aware that Jacqueline Duchene had any input on the decision to terminate his employment. Doc. 38-1 at 80.

Defendant's corporate representative states that Plaintiff's termination was one of its "strategic decisions" to reconsider the structure of the entire organization in light of the unprecedented circumstances. Doc. 38-2 at 21.  Rather than filling Plaintiff's role, Defendant eliminated the Directors of Front and Back of the House roles and

combined their functions into a single position called the Director of Operations. Doc. 41 ¶¶ 13-14; Doc. 29-3 at 47-48.  According to Travis Johnson, "[w]e had to find ways to adjust and become efficient and that was one that…we were unable to carry the labor of both a front and the back of the house role. … [I]n great economic times, there was probably…the ability to justify having two different individuals oversee these different entities, whereas when the volume becomes heavily reduced, we had one individual." Doc. 29-3 at 7, 48.  Tim Johnson assumed the new consolidated role. Doc. 41 ¶ 14.  He had spent most of his TradeWinds career in front of house roles, and had also served in a back of house role as the Director of Housekeeping approximately one decade earlier, including a two-year period when he was Plaintiff's supervisor. *Id.*; Doc. 38-1 at 55.

Plaintiff was the only member of the executive committee who was terminated. Doc. 38-2 at 31; Doc. 38-1 at 41.  Plaintiff is aware of three other employees who had the job title of director but who were not on the executive committee, whom Defendant also terminated in 2020; two are white and one is African American. *Id.* at 50-51. Likewise, he is aware of another director, not on the executive committee, who is African American and who was neither terminated nor furloughed. *Id.* at 51-52.  In all, Defendant terminated approximately 260 employees due to the COVID-19 pandemic. Doc. 41 ¶ 12.  Defendant's annual revenue in 2019 was just over $87 million. Doc. 38-3 at 5.  In 2020, it was just over $46 million. *Id.*  In 2021, it returned to nearly $82 million. *Id.*

Plaintiff's termination letter stated that he would be identified in Defendant's records as "eligible for rehire," and that he "should not hesitate to apply for reemployment in the future." Doc. 29-1 at 62.  Plaintiff reports that Travis Johnson and Glenn Willocks told him when they notified him that he was terminated that he was "rehireable as soon as things picked up," and that he "made it clear to them…that as soon as anything was available, anything, that I would come back to work." Doc. 38-1 at 40-41.  He did not apply for another job with Defendant because "I didn't think I needed to," as he was aware that his old position had not been filled. *Id.*  For his part, Travis Johnson does not recall having a conversation with Plaintiff in which Plaintiff expressed interest in other positions or available positions; he states that any open positions were publicly posted. Doc. 38-2 at 32-33.

### D. Plaintiff's Claims

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on January 19, 2021, and received a notice of the right to sue. *Id.* at 107; Doc. 7-1.  He initiated the instant action on December 7, 2023. Doc. 1. The Amended Complaint alleges racial discrimination in the form of his termination and a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 (Count I) and 42 U.S.C. § 1981 (Count III). Doc. 7.  The Amended Complaint further alleges that his termination was retaliatory, in violation of Title VII (Count II). *Id.*

Plaintiff explained in his deposition that he believes his termination was racially discriminatory because his was one of "the most essential" roles at the resort. Doc. 38-

1 at 40, 83, 90, 123.  Before the pandemic he had been particularly busy, because the new ownership had initiated capital improvement projects and required all vendors to be vetted again. *Id.* at 23-24.  When the pandemic began, he led the resort's COVID-19 response, including sourcing vendors to obtain personal protective equipment and complying with other government requirements. *Id.* at 33.  Even after he was furloughed, he continued working on site for at least a week, and he took calls from his staff for even longer. *Id.* at 36.  Given the importance of his responsibilities, Plaintiff believes the other individuals Defendant chose to bring back were less essential than he was. *Id.* at 40, 83, 123.  He also believes that the executive committee failed to abide by its initial plan to conduct furloughs based on seniority and performance, instead conducting them in a "hodge podge" that "benefit[ted] one group." *Id.* at 88.

Plaintiff also believes that his furlough and termination were retaliatory, because of certain remarks by 1754 Properties employees Joe Smith and Joe Kelley at two executive committee meetings in the early stages of the pandemic. *Id.* at 80, 120-21.  They stated that the need for furloughs was an opportunity to "get rid of all the problem children." *Id.*  Accordingly, Kelley directed the executive committee to "look into employment issues, in particular, people that had HR problems, worker's comp, and to get with Glenn Willocks and…Travis Johnson [and] create a list of employees that would be going first" for furlough or termination. *Id.* at 121.  Plaintiff believes that, by complaining to Duchene about Reese's use of the N-word soon afterward, he placed himself into the category of a problem employee who had "HR issues." *Id.* at 132.  Although Duchene was not on the executive committee herself, he observed

Duchene and Willocks openly "discuss[] every single employment type of situation" in their shared office. *Id.* at 132-33.[5]

Defendant moves for summary judgment on all three counts. Doc. 29.

## II.    LEGAL STANDARD

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).   In determining whether a genuine issue of material fact exists, the Court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).   Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   A fact is "material" if it may affect the outcome of the suit under governing law. *Id.*

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).   That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support

---

[5] In Plaintiff's response in opposition to Defendant's motion for summary judgment, he claims Duchene told another employee that she was "glad to see the silverback go," referring to Plaintiff after he was furloughed. Doc. 37 at 6.  However, this statement does not appear in the record evidence before the Court and will not be considered.

the nonmoving party's case." *Celotex*, 477 U.S. at 325.  "Only when that burden has been met does the burden shift to the non-moving party." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

"[I]n order to survive summary judgment, the nonmoving party must set forth specific facts showing there is a genuine issue for trial." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, 826 F. App'x 766, 770 (11th Cir. 2020), citing *Anderson*, 477 U.S. at 249-50.  "[U]nsupported 'conclusory allegations' do not suffice." *Middlebrooks v. Sacor Fin., Inc.*, 775 F. App'x 594, 596 (11th Cir. 2019).  Likewise, the "'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson*, 826 F. App'x at 770, quoting *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION

### A. Plaintiff has Abandoned his Hostile Work Environment Claim.

In Count I, Plaintiff asserts that Defendant created a hostile work environment and terminated him because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). Doc. 7 ¶¶ 49-63, *see* ¶ 51 (hostile work environment). Count III asserts that Defendant discriminated against him based on his race by creating a hostile work environment, in violation of 42 U.S.C. § 1981. *Id.* ¶¶ 79-90, *see* ¶ 86 (hostile work environment).

In its motion for summary judgment, Defendant argues that Plaintiff's hostile work environment claim is time-barred, because the alleged underlying conduct did not occur within 300 days of the filing of his charge of discrimination. Doc. 29 at 20-

21. In addition, Defendant argues that the alleged conduct does not support a finding of a hostile work environment. Doc. 29 at 21-25.  Plaintiff does not respond to Defendant's arguments regarding his hostile work environment claim, nor does he refer at all to a hostile work environment, § 1981, or Count III in his response. Doc. 37. With respect to his racial discrimination claim, he argues only that he can establish that he was discriminated against because of his race, "in violation of Title VII," *id.* at 8, based on his furlough and termination. *Id.* at 10-11.

"[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations omitted); *see Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1182 (11th Cir. 2024) (affirming district court ruling that plaintiffs forfeited the claims for equitable relief in their complaint by failing to make any arguments for equitable relief in their summary judgment papers, where defendant's motion put plaintiffs on notice that it sought summary judgment on all claims).  Here, by failing to respond to Defendant's specific arguments seeking summary judgment on his hostile work environment claim in Counts I and III, Plaintiff has abandoned that claim. Accordingly, Defendant is entitled to summary judgment with respect to the hostile work environment claim in Counts I and III.[6]

---

[6] Even if the Court were to address the merits of Plaintiff's abandoned hostile work environment claim, it would find that the claim is time-barred for the reasons detailed in Defendant's motion. *See* Doc. 29 at 20-21, citing 42 U.S.C. § 2000e-5(e)(1) and *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1238 (11th Cir. 2004) ("For a[n EEOC] charge [of discrimination] to be timely in Florida…it must be filed not more than 300 days after the alleged unlawful employment practice occurred."); *see also*, *e.g.*, *EEOC v. Joe's Stone Crabs, Inc.*,

**B. Plaintiff has Failed to Create a Genuine Dispute of Material Fact as to Pretext.**

The claim within Count I that Plaintiff has not abandoned is that his furlough and termination constituted racial discrimination in violation of Title VII. Doc. 7 ¶¶ 49-63. In Count II, he asserts that Defendant committed Title VII retaliation against him by furloughing and terminating him after he complained about racial discrimination. *Id.* ¶¶ 65-77.

Title VII prohibits an employer from discharging an employee because of his race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff who relies on circumstantial evidence to support his claim of racial discrimination under Title VII may employ the *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, the plaintiff must carry the initial burden of establishing a *prima facie* case of racial discrimination. *Id.*[7] If he is successful, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the action the

---

296 F.3d 1265, 1271 (11th Cir. 2002) (stating same, concluding that "only those claims arising within 300 days prior to the filing of the EEOC's discrimination charge are actionable."); *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 449 (11th Cir. 1996) (the timely filing of a charge of discrimination is a prerequisite to filing a Title VII suit).

[7] Because this case involves a reduction in force, both parties advocate for the use of a *prima facie* framework that is modified from the usual framework employed in racial discrimination cases. *See* Doc. 29 at 9; Doc. 37 at 9. Each party's preferred elements differ slightly from the other's, although both are taken from cases involving Age Discrimination in Employment Act ("ADEA") claims. Generally, both parties suggest a plaintiff will establish a *prima facie* case of discriminatory discharge if he (1) is a member of a protected group, (2) was adversely affected by an employment decision, (3) was qualified for his own position or another position at the time of discharge, and (4) his employer discharged him for a discriminatory reason. *See id.*

plaintiff alleges is discriminatory. *Id.*; *see also*, *e.g.*, *Poer v. Jefferson Cnty. Commission*, 100 F.4th 1325, 1336 (11th Cir. 2024). Then, if the employer meets its burden, the plaintiff may avoid summary judgment by "introduc[ing] significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Poer*, 100 F.4th at 1336 (citations and quotations omitted).

Title VII further prohibits an employer from retaliating against an employee "because he has opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). To make out a *prima facie* case for Title VII retaliation, a plaintiff must show: (1) that he was engaged in statutorily protected activity, (2) that he suffered an adverse action, and (3) that the adverse action was causally related to the protected activity. *See*, *e.g.*, *Gogel v. Kia Motors Mf'g of Ga., Inc.*, 967 F.3d 1121, 1134-35 (11th Cir. 2020). As with discrimination claims, once the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to rebut the presumption of retaliation by articulating a legitimate, non-discriminatory reason for the adverse action. *Id.* at 1135. The plaintiff must then demonstrate that the proffered reason was a pretext for retaliation. *Id.*

Here, the parties first dispute whether Plaintiff has established a *prima facie* case of discrimination or retaliation. Doc. 29 at 10-14, 25-26; Doc. 37 at 8-10, 12-16. Defendant proffers a non-discriminatory reason for Plaintiff's furlough and termination: economic need caused by the COVID-19 pandemic, which led to a reduction-in-force and the elimination of Plaintiff's position. Doc. 29 at 14-15, 26. The

parties then dispute whether Defendant's stated reason was pretextual. *Id.* at 16-17, 27; Doc. 37 at 11.

For the purpose of the motion for summary judgment, the Court need not determine whether Plaintiff has established a *prima facie* case as to either discrimination or retaliation. The Court will assume, *arguendo*, that he has. *See, e.g., Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1308 (11th Cir. 2023) ("We assume without deciding that Berry established a prima facie case of retaliation and consider whether she presented evidence of pretext."); *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002) (same). However, it finds that Defendant is entitled to summary judgment under the final step of the *McDonnell Douglas* framework, because a reasonable jury could not conclude that Defendant's proffered reason for the furlough and termination was pretextual.

### 1. <u>The Parties' Arguments</u>

Defendant argues that it eliminated Plaintiff's position, along with hundreds of others, due to the economic uncertainty caused by the COVID-19 pandemic. Doc. 29 at 11-12, 15. Specifically, it decided to consolidate Plaintiff's position with another highly-paid position, and offered the consolidated position to the only person who had experience in both areas covered by the new position. *Id.* at 12, 15, 17.

Plaintiff's response regarding pretext comprises one short paragraph. Doc. 37 at 11. He asserts that pretext is evident from the executive committee's statement that the pandemic would be used as an excuse to get rid of the "problem children," as well as the fact that many employees were brought back who were less essential than

Plaintiff, and he was not brought back even after business recovered. *Id.* Elsewhere in his response, he contends that racial discrimination was the only reason he did not have Tim Johnson's experience in both areas, and that he and Johnson are otherwise similarly situated. *Id.* at 10. With regard to retaliation, he points out that he was furloughed just two business days after he complained about being called the N-word. *Id.* at 14-15. Plaintiff also relies on the "cat's paw" theory to argue that Duchene shared the complaint with the executive committee or otherwise influenced the executive committee's decision. *Id.* at 16.

In reply, Defendant argues that it had not yet experienced an economic rebound by the time of Plaintiff's termination, and, indeed, lost half of its normal revenue in 2020. Doc. 42 at 2. Defendant asserts there is no evidence to suggest that "problem children" referred to individuals of a certain race, and points to statistics of the RIF that do not indicate African-American employees were disproportionately targeted. *Id.* at 2-3. With respect to Tim Johnson's front of house experience, Defendant argues Plaintiff's allegations that racial discrimination prevented him from obtaining such experience are stale and vague, do not create an actionable claim, and are not relevant to the question of pretext in Defendant's decision to offer the consolidated position to the more experienced employee. *Id.* at 3-5. Finally, Defendant characterizes Plaintiff's claim that Duchene influenced the executive committee or brought any complaints to the executive committee as unsupported by the record. *Id.* at 5-6.

2. <u>Analysis</u>

An employee seeking to establish pretext must identify "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's stated reason. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1308 (11th Cir. 2023) (citations and quotations omitted). "A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Poer*, 100 F.4th at 1336 (citations and quotations omitted) (emphasis in original). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

Moreover, in arguing that a defendant's reason is pretextual, "[a] plaintiff is not allowed to…substitute his business judgment for that of the employer." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). This is because "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. … Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.* (quotations omitted). The Eleventh Circuit has "repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law[,]" because it is not "in the business of adjudging whether employment decisions are prudent or fair." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Here, Defendant contends that it eliminated Plaintiff's position, consolidating it with the Director of Front of the House Operations position, in order to save money in a year when its revenue ended up at half of its normal annual revenue. Notably, Defendant made the decision in July 2020, when the effects of the COVID-19 pandemic were ongoing and of uncertain magnitude; whether Defendant would recover was unknown. Defendant testified that having separate directors of operations for the front of the house and the back of the house was a luxury that it could afford in better economic times, but that the resort could get by with just one when times were lean. *See* Doc. 29-3 at 48. To fill the new consolidated position, Defendant chose to bring Tim Johnson back from furlough rather than Plaintiff. It is undisputed that Johnson had experience in both front and back of house positions—even though his more recent experience, and the majority of his experience, was in the front of the house—while Plaintiff's experience was almost exclusively in the back of the house.

Plaintiff's argument that this decision was racially discriminatory is largely a quarrel with Defendant's business judgment. Despite Plaintiff's opinion that his own position was the most essential role at the resort, it was Defendant's prerogative to disagree, and to decide that the back of the house director duties could be completed within a consolidated position. *See Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312–13 (11th Cir. 2018) (affirming summary judgment for defendant where plaintiff's arguments "merely dispute the wisdom of [defendant's] reasoning, which is insufficient to establish pretext."); *cf. Shannon v. Bellsouth Telecom., Inc.*, 292 F.3d 712, 717 (11th Cir. 2002) (denying defendant's motion for judgment as a matter of law

where its nondiscriminatory reason for plaintiff receiving fewer overtime opportunities did not explain why plaintiff would be "totally blackballed" from overtime opportunities that remained open to other employees).

Likewise, despite Plaintiff's argument that business recovered enough to rehire him, Defendant's non-discriminatory reason that business had not recovered enough by the time of Plaintiff's termination is supported by the fact that it never filled Plaintiff's old position, and it laid off hundreds of people, including several people at the director level just below Plaintiff.  Plaintiff offers no evidence to counter this, such as statistical or even anecdotal evidence that the reduction in force resulted in more white employees retaining their jobs. *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (plaintiff's "own conclusory observation that Cubans 'seem to get terminated at a very high rate without justification,' which she never backed up with any specifics," coupled with a racially derogatory comment by defendant's president, were "too weak to raise a genuine fact issue" as to pretext.); *cf. Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) (plaintiff survived summary judgment with, *inter alia*, specific evidence of defendant's pattern of terminating older, highly experienced employees and replacing them with younger people); *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1209-10 (11th Cir. 1997) (same). Indeed, Defendant has offered examples to the contrary. *See* Doc. 38-1 at 50-52.  As in *Kirkland v. City of Tallahassee*, 856 F. App'x 219, 224 (11th Cir. 2021), Plaintiff "questions the necessity and implementation of the reduction in force, but he failed to

introduce any evidence that was inconsistent with it as a legitimate explanation for his termination."

With regard to Defendant's choice to place Tim Johnson into the new consolidated position instead of Plaintiff, Plaintiff does not specifically dispute that Johnson was better suited for the role because of his experience in both front and back of the house roles at the TradeWinds. Plaintiff instead argues that Plaintiff was not able to obtain the same front of the house experience as Johnson because of past racial discrimination, so Johnson's experience should not be considered. The problem with this argument is that the alleged past discrimination was committed by a different owner and different decisionmakers than the ones that terminated Plaintiff. Plaintiff does not allege that he was passed over for any front of house positions during the time that Defendant managed the resort or that 1754 Properties owned it. He accuses Keith Overton of handpicking white employees to fill the front of the house roles that Plaintiff sought—but Overton was no longer employed with Defendant as of December 2019 and was not a decisionmaker in the adverse actions here. There is no evidence that the decisionmakers for Plaintiff's termination, Travis Johnson and the 1754 Properties' asset management team, were involved in any alleged past discrimination. Accordingly, this claim would not allow a reasonable jury to find that Defendant's stated reason for terminating Plaintiff was pretext for racial discrimination.

In addition to racial discrimination, Plaintiff contends that his furlough and termination were retaliation for his complaints regarding racial discrimination, particularly his HR complaint about Steve George's failure to rebuke a terminated

employee for calling Plaintiff the N-word.  Plaintiff has also failed to establish that Defendant's stated reason for furloughing and terminating him was a pretext for unlawful retaliation.

It is true that Plaintiff's furlough occurred very shortly after his complaint. Close temporal proximity between a protected activity and an adverse action can create an inference of causation. *See*, *e.g.*, *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  Moreover, Plaintiff's testimony about Joe Kelley's instruction to make a list of "problem children" to furlough or lay off, including those with "HR issues," constitutes some circumstantial evidence that Plaintiff's furlough was retaliatory.  A reasonable jury could find that Duchene or Willocks, who were in close communication with each other, shared Plaintiff's complaint with the executive committee in response to Kelley's directive that Willocks and Johnson provide a list of problem employees to target.[8]  As a result, it is likely that Plaintiff could establish a *prima facie* case of retaliation.

---

[8] The Court does not find it necessary to apply the "cat's paw" theory that Plaintiff advocates. Doc. 37 at 15-16.  The cat's paw theory requires the decisionmaker of an adverse action to follow the recommendation of a biased non-decisionmaker, without independently investigating the basis for the recommendation. *See*, *e.g.*, *Matamoros v. Broward Cnty. Sheriff's Office*, 2 F.4th 1329, 1336 (11th Cir. 2021); *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1328-29 (11th Cir. 2020).  Here, the cat's paw theory is not needed because any retaliatory animus would have come from Joe Kelley, who made the statement about "problem children" and who was one of the decisionmakers.  A jury need only make the reasonable inference that he learned of Plaintiff's HR complaint, thus qualifying Plaintiff as a "problem child" whom Kelley sought to get rid of.

Alternatively, to the extent Plaintiff seeks to use the cat's paw theory to argue that the discriminatory or retaliatory animus came from Duchene, who then influenced the decisionmakers to furlough or terminate Plaintiff, the Court's analysis regarding pretext is unchanged.  Plaintiff has failed to offer more than speculation or a "mere scintilla" of evidence

A *prima facie* case, however, is not enough: Plaintiff must also meet Defendant's non-retaliatory reason "head on and rebut it." *Chapman*, 229 F.3d at 1030; *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987) ("[A] plaintiff may not in all cases merely rest on the laurels of her prima facie case in the face of powerful justification evidence offered by the defendant."). While temporal proximity may be enough to establish a causal connection for a *prima facie* case, it is rarely sufficient, standing alone, to show pretext. *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). In *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 925-26 (11th Cir. 2018), for example, the defendant argued that the non-retaliatory reason for terminating plaintiff was a negative performance evaluation. In addition to the close temporal proximity between the plaintiff's complaint about racial discrimination and the negative evaluation, the plaintiff offered the following evidence to rebut the defendant's reason: her supervisor testified that she had never before filled out that type of evaluation or reprimanded anyone else for the same behavior, the defendant failed to follow its progressive discipline policy, and the evaluation stated that the plaintiff was performing well. *Id.* at 926. Accordingly, the court found that the evidence was sufficient to establish a jury question as to whether her termination was retaliation for her complaint about racial discrimination. *Id.*

---

that Duchene sought to discriminate against him because of his race or retaliate against him for making complaints about her in the past, causing her to somehow exert influence over Travis Johnson and Joe Kelley's decision. *Anderson*, 477 U.S. at 252. Accordingly, this theory will not defeat summary judgment.

Here, additional evidence of pretext beyond temporal proximity and the "problem children" statement is lacking.  Although Plaintiff testified that his furlough was inconsistent with the executive committee's discussions that furloughs would be based on seniority and would not include executive committee members, it is undisputed that Tim Johnson, the employee Plaintiff describes as "the only real comparator," Doc. 37 at 10, was also furloughed at approximately the same time. There is no evidence that Johnson made any complaints or had any "HR issues."  Nor has Plaintiff produced evidence of a pattern of furloughs or terminations of employees who made complaints, let alone other examples.  Further, the fact that the furloughs occurred in March 2020, a time when the resort was at near-zero capacity and the pandemic had just begun, and Defendant furloughed the only two highly-paid executive committee members who were not at the vice president level, significantly bolsters Defendant's non-retaliatory reason.  Finally, the same evidence that supports Defendant's non-discriminatory reason for terminating Plaintiff also supports its argument that the termination was not retaliatory.  The fact that Plaintiff's position was never filled after he was terminated cuts sharply against a finding that Defendant's stated reason was false and a pretext for retaliation.  Similarly, Plaintiff presents no evidence that he ever applied for an open position with Defendant and was rejected, or that Defendant failed to consider him for a position that became available that he would have been qualified for when its financial status stabilized.

In all, a reasonable jury could not find that that the reason Defendant offered for furloughing and terminating Plaintiff was pretext for racial discrimination or

retaliation.  Because Plaintiff has failed to create a genuine dispute of material fact with respect to pretext, Defendant is entitled to summary judgment in its favor on all counts of the Amended Complaint.

Accordingly, it is **ORDERED**:

1. Defendant Gulf Hospitality Management, LLC's Motion for Summary Judgment (Doc. 29) is GRANTED.

2. The Clerk is directed to enter judgment in favor of Defendant Gulf Hospitality Management, LLC, and against Plaintiff Markelito Saint Hubert.

3. The Clerk is further directed to terminate any pending motions and deadlines and CLOSE this case.

**DONE** and **ORDERED** in Tampa, Florida on July 14, 2025.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:
Counsel of Record